ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EDWIN MARTÍNEZ FERNÁNDEZ; ALBERTO L. ORTIZ MOLINA<br>RECURRENTE<br><br>V.<br><br>OFICINA DE GERENCIA DE PERMISOS<br>AGENCIA RECURRIDA<br><br>QMC TELECOM, LLC<br>PROPONENTE - RECURRIDA | KLRA202100608 | Revisión judicial procedente de la Oficina de Gerencia de Permisos<br><br>Núm. 2020-301952-PCOC-016054<br><br>Sobre: Permiso de construcción |

Panel integrado por su presidenta, la Jueza Domínguez Irizarry, la Jueza Rivera Marchand y el Juez Salgado Schwarz.

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de marzo de 2024.

Comparecen Edwin Martínez Fernández y Alberto L. Ortiz Molina (recurrentes) y solicitan la revisión de la aprobación del Permiso de Construcción de una torre de telecomunicaciones tipo *monopole* 2020-301952-PCOC-016054, emitida por la Oficina de Gerencia de Permisos (OGPe) el 8 de octubre de 2021, notificada el 25 de octubre de 2021.

Por los fundamentos que expondremos a continuación, confirmamos la determinación administrativa recurrida.

**I.**

QMC Telecom LLC. (QMC) instó una solicitud de permiso de ubicación o construcción de una estructura de telecomunicación (tipo *monopole*) de 180' de altura para ubicar antenas de transmisión y equipo de compañías de telecomunicaciones en el Barrio Machos del Municipio de Ceiba y aledaño al complejo residencial Castillos del Mar.

Número Identificador

SEN2024_____

Junto a su petición, QMC incluyó múltiples documentos y en particular una copia de una carta en la que acredita haber notificado a los vecinos colindantes y publicado un edicto, así como certificaciones de envío por correo electrónico, mapa del CRIM con lista de colindantes, edicto publicado, ejemplo de carta entregada personalmente y notificada al Municipio en cumplimiento del Reglamento Conjunto para la Evaluación y Expedición de Permisos relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios (Reglamento Conjunto 2020) y la Ley 89 de 6 de junio de 2000.[1]

Así las cosas, el 13 de julio de 2021, Alberto L. Ortiz presentó una solicitud de intervención ante la OGPe. La misma fue autorizada mediante *Resolución* emitida el 14 de julio de 2021. De igual forma, a petición de Edwin Martínez Fernández, la agencia recurrida emitió una segunda *Resolución,* el 21 de julio de 2021, en la cual también autorizó su solicitud de intervención en el referido proceso de permisos. Según surge de ambas resoluciones, los interventores, (Alberto L. Ortiz y Edwin Martínez Fernández), se opusieron al permiso por múltiples razones. A modo de ejemplo: que el referido permiso no cumple con los reglamentos aplicables; que la instalación propuesta es próxima a una reserva natural; y que presenta un potencial riesgo para la salud humana debido a la exposición a la radiofrecuencia y posible violación a la regulación de la Federal Communications Commission (FCC). Sin embargo, la OGPe no se pronunció sobre tales asuntos.[2]

Insatisfecho, el 13 de septiembre de 2021, los interventores, junto a la Asociación de Residentes de Castillos del Mar (Asociación), presentaron una *Moción urgente para la paralización de construcción, asumiendo representación legal, intervención, solicitud de expediente y otros asuntos* en la que la Asociación solicitó la intervención por vez primera.[3] Además, argumentaron sobre los

---

[1] Apéndice, págs. 7-39.
[2] Apéndice, págs. 40-46.
[3] Apéndice, págs. 50-64.

fundamentos para constatar la supuesta ilegibilidad del proyecto de QMC. En particular, expusieron que, la parte interventora había presentado una querella, ante la FCC, en búsqueda de una evaluación ambiental, para así desautorizar la continuación del proyecto. A su petitorio unieron cartas de la Asociación y la Resolución Núm. Serie 2021-2022 de la Legislatura Municipal de Ceiba en oposición al proyecto.[4] Al no recibir respuesta de la agencia, el 30 de septiembre de 2021, los peticionarios instaron una segunda moción de paralización y reclamaron que se autorizara la intervención de la Asociación.[5]

Pendiente lo anterior, la OGPe expidió el Permiso de Construcción el 7 de octubre de 2021, notificado el 25 de octubre de 2021. En reacción, Alberto L. Ortiz, Edwin Martínez Fernández y la Asociación (a pesar de no haber recibido contestación a su solicitud de intervención), mediante moción presentada el 13 de noviembre de 2021, nuevamente reiteraron la solicitud de intervención de la Asociación y la paralización de la construcción.[6]

Evaluado lo anterior, el 15 de noviembre de 2021, la OGPe emitió una *Resolución sobre Solicitud de Intervención*. En esta, únicamente atendió y denegó la solicitud de intervención de la Asociación.[7] De la determinación administrativa surge que, la agencia consideró que, a la fecha del 8 de octubre de 2021, ya se había autorizado el permiso, por lo que, en ausencia de un proceso adjudicativo pendiente, la solicitud de intervención de la Asociación resultaba a destiempo y no cumplía con las disposiciones aplicables. En esa misma semana, el 12 de noviembre de 2021, el Municipio Autónomo de Ceiba presentó una moción solicitando intervención y uniéndose a la solicitud de la Asociación. Surge del expediente administrativo que, la OGPe denegó el referido petitorio del municipio. [8] No surge del expediente que, la Asociación o el

---

[4] Apéndice, págs. 65-103.
[5] Apéndice, pág. 104-114.
[6] Apéndice, págs. 115-128.
[7] Apéndice, págs. 184-195.
[8] Apéndice, págs. 207-212. Véase además el Expediente Administrativo Tomo 3.

Municipio hayan cuestionado las referidas denegatorias ante la propia agencia o esta Curia.

Inconformes, los recurrentes, (como interventores reconocidos por la OGPe), acuden ante esta Curia el 24 de noviembre de 2021 y señalan la comisión de los siguientes errores:

Erró la OGPe al emitir el Permiso de Construcción 2020-301952-PCOC-016054 utilizando como fuente de derecho los Reglamentos Conjuntos 2019 y 2020, los cuales fueron declarados nulos por este Honorable Tribunal de Apelaciones en los casos *Comité Pro-Seguridad ARRAQ y ARESPA y su presidenta Vanessa D. Ríos Grajales v. Junta de Planificación,* KLRA20210044; *Fideicomiso de Conservación de Puerto Rico y Para La Naturaleza, Inc. v. ELA et. al.*, KLRA20210047; *AEQUITAS, LLC v. Junta de Planificación,* KLRA201900413.

Erró la OGPe al no permitir la intervención de la Asociación de Residentes de Castillos del Mar en los procesos para la adjudicación y aprobación del Permiso de Construcción 2020-301952-PCOC-016054.

Erró la OGPe al emitir el Permiso de Construcción 2020-301952-PCOC-016054 y no cumplir con su deber ministerial de paralizar la obra y denegar el permiso solicitado, en atención a las normas de co-ubicación y a los requisitos de notificación a los residentes colindantes dentro del radio de seguridad, o la distancia radial de cien (100) metros tomando como centro la ubicación propuesta.

Erró la OGPe al emitir el Permiso de Construcción 2020-301952-PCOC-016054 y no cumplir con su deber ministerial de paralizar la obra y denegar el permiso solicitado, en atención a que la Federal Communications Comission (FCC) tiene ante su consideración, aun sin haberse adjudicado, una solicitud de evaluación ambiental (Environmental Assessment) relacionada al detrimento que la construcción ocasionaría a los recursos naturales y ambientales, y los problemas de seguridad relacionados a la ubicación propuesta en una zona catalogada como inundable.

En cumplimiento con nuestra *Resolución* emitida el 30 de noviembre de 2021, QMC acreditó su alegato en oposición el 23 de diciembre de 2021 y la OGPe compareció ante nos, mediante *Oposición a recurso de revisión* instada el 10 de enero de 2022.

Evaluado lo anterior, esta Curia emitió una *Sentencia* el 10 de febrero de 2022, en la cual revocamos el dictamen recurrido en atención a lo resuelto por el Tribunal Supremo en *Aequitas, LLC v. Junta de Planificación,* 2020 TA 434, y *Comité Pro-Seguridad ARRAQ y ARESPA y otro v. Junta de Planificación,* 2021 TA 850, sobre la nulidad de los Reglamentos Conjuntos 2019 y 2020, respectivamente. El referido dictamen fue objeto de revisión ante el Tribunal Supremo y mediante su dictamen (*Per Curiam*) emitido el

16 de junio de 2023, el Alto Foro determinó que dichos Reglamentos se consideran nulos de forma prospectiva. Concluyó además que, la referida nulidad no invalidó el permiso de epígrafe. En su consecuencia, ordenó a esta Curia atender los méritos del presente recurso.

Por ello y con el beneficio de la comparecencia de las partes, así como de la copia certificada del expediente administrativo, resolvemos.

## II.

### A. Revisión administrativa judicial

La Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, 3 LPRA secc. 9601-9713, (LPAUG), tuvo el propósito de uniformar los procedimientos administrativos ante las agencias. De esta forma, la precitada ley estableció un cuerpo de reglas mínimas para gobernar los procesos de adjudicación y reglamentación en la administración pública. *SLG Saldaña-Saldaña v. Junta,* 201 DPR 615 (2018).

La Sección 4.1 de la LPAUG, *supra,* dispone que las decisiones administrativas finales pueden ser revisadas por el Tribunal de Apelaciones. 3 LPRA sec. 9671. La finalidad de esta disposición es delimitar la discreción de los organismos administrativos para asegurar que estos ejerzan sus funciones conforme a la ley y de forma razonable. *Capó Cruz v. Junta de Planificación,* 204 DPR 581 (2020); *Empresas Ferrer, Inc. v. A.R.P.E.,* 172 DPR 254, 264 (2007).

Sabido es que, las decisiones de los organismos administrativos están revestidas de una presunción de regularidad y corrección. *Comisionado de Seguros de Puerto Rico v. Corporación para la Defensa del Poseedor de Licencia de Armas de Puerto Rico, Inc.,* 202 DPR 842 (2019).[9] Esto debido a que, mediante esta norma "reconocemos el *expertise* del que gozan los organismos administrativos en aquellas materias que le han sido delegadas por

---

[9] Citando a *Mun. de San Juan v. CRIM,* 178 DPR 163, 175 (2010).

ley". *Íd.*[10] Véase además lo resuelto en *OEG v. Martínez Giraud,* 210 DPR 79, 90-91 (2022).

Cónsono con lo anterior, la sección 4.5 de la LPAUG, *supra,* establece que los tribunales deben sostener las determinaciones de hechos de las agencias si están basadas en "evidencia sustancial que obra en el expediente administrativo". 3 LPRA sec. 9675. Como vemos, la norma anterior nunca ha pretendido ser absoluta. Por eso, el Tribunal Supremo ha resuelto con igual firmeza que los tribunales no podemos imprimirle un sello de corrección, so pretexto de deferencia, a las determinaciones o interpretaciones administrativas irrazonables, ilegales, o simplemente, contrarias a derecho. *Super Asphalt Pavement Corp. v. Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, A&M Group,* 206 DPR 803 (2021); *Graciani Rodríguez v. Garage Isla Verde,* 202 DPR 117 (2019).[11]

Sin embargo, la citada Sección 4.5 de la LPAUG, *supra,* dispone que "[l]as conclusiones de derecho serán revisables en todos sus aspectos por el tribunal". Aun así, se sustituirá el criterio de la agencia cuando no se pueda hallar fundamento racional que explique o justifique el dictamen administrativo. *Rolón Martínez v. Superintendente,* 201 DPR 26 (2018).[12] Por ende, "los tribunales deben darle peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra". *Íd.*[13] Lo anterior responde a la vasta experiencia y conocimiento especializado que tienen las agencias sobre los asuntos que le son encomendados. *González Segarra et al. v. CFSE,* 188 DPR 252, 276 (2013).[14] Por consiguiente, dada la presunción de corrección y regularidad que reviste a las determinaciones de hecho elaboradas por las agencias administrativas, éstas deben ser respetadas

---

[10] Citando a *OCS v. Universal,* 187 DPR 164, 178 (2012); *The Sembler Co. v. Mun. de Carolina,* 185 DPR 800 (2012).
[11] Citando a *IFCO Recycling v. Aut. Desp. Sólidos,* 184 DPR 712, 746 (2012); *Empresas Ferrer v. A.R.P.E.,* *supra,* pág. 264.
[12] Citando a *Asoc. Fcias. v. Caribe Specialty et al. II,* 179 DPR 923, 941 (2010).
[13] Citando a *Torres Rivera v. Policía de PR,* 196 DPR 606, 657 (2016).
[14] Citando a *Hernández, Álvarez v. Centro Unido,* 168 DPR 592, 614 (2006); *Vélez v. A.R.P.E.,* 167 DPR 684, 693 (2006).

mientras la parte que las impugne no produzca evidencia suficiente para derrotarlas. *Graciani Rodríguez v. Garage Isla Verde*, supra.

Al revisar las decisiones de las agencias, el criterio rector que debe guiar a los tribunales es la razonabilidad de la actuación, aunque ésta no tiene que ser la única o la más razonable. *Vargas Serrano v. Inst. Correccional,* 198 DPR 230, 237 (2017). Por lo tanto, si al momento de examinar un dictamen administrativo se determina que: (1) la decisión administrativa no está basada en evidencia sustancial; (2) la agencia erró en la aplicación de la ley; (3) el organismo administrativo actuó de manera irrazonable, arbitraria o ilegalmente; o (4) su actuación lesiona derechos constitucionales fundamentales, entonces la deferencia hacia los procedimientos administrativos cede. *Empresas Ferrer, Inc. v. A.R.P.E.,* supra, pág. 264.

**B. Ley Núm. 161-2009, Ley para la Reforma del Proceso de Permisos de Puerto Rico**

La Ley Núm. 161-2009, Ley para la Reforma del Proceso de Permisos de Puerto Rico, según enmendada, 23 LPRA sec. 9011 *et al.*, estableció un nuevo marco legal y administrativo que habría de guiar la solicitud, evaluación, concesión y denegación de permisos vinculados al desarrollo de obras de construcción y otras actividades relacionadas por parte del gobierno de Puerto Rico. Mediante el referido estatuto se creó la Oficina de Gerencia de Permisos (OGPe) como el organismo administrativo encargado de emitir determinaciones finales y permisos, licencias, inspecciones, certificaciones y cualquier otra autorización o trámite que sea necesario. A esos efectos, la Ley Núm. 161-2009, *supra*, le transfirió a esta agencia las facultades que antes tenían otras agencias, en particular, la ARPE. La referida ley también le confirió el poder a ciertos Municipios Autónomos, con jerarquía I a la V los cuales podían mediante convenios, recibir por delegación, las funciones de otras agencias como ARPE.

**C. Ley Núm. 89-2000**

Por otro lado, la *Ley sobre la Construcción, Instalación y Ubicación de Torres de Telecomunicaciones de Puerto Rico*, según enmendada, Ley Núm. 89-2000, 27 LPRA secs. 321 y siguientes, establece que el gobierno local conserva la autoridad con relación a la ubicación, construcción y modificación de facilidades de telecomunicaciones inalámbricas. 27 LPRA sec. 322. Igualmente, la Ley Núm. 89-2000 propende a un balance de intereses, entre la regulación de la construcción de torres de telecomunicaciones, la seguridad y los derechos de los ciudadanos. Ley Núm. 89-2000, Exposición de Motivos; *Mun. de San Sebastián v. QMC Telecom*, supra, pág. 666.[15] Para lograr lo anterior, se estableció como política pública la ubicación de antenas de telecomunicaciones en una misma facilidad y la armonización de las necesidades de cobertura de las empresas de telecomunicaciones con los intereses de la ciudadanía. *Íd.*

De otra parte, mediante la Ley 89-2000, *supra,* se establecieron los requisitos específicos y la política pública para proyectos de coubicación de torres, a saber:

**Uso integrado de infraestructura coubicación**

A los fines de que en cualquier consideración para la concesión de un permiso para la construcción o ubicación de torres que hayan de albergar estaciones de transmisión de frecuencia radial "antenas" para fines comerciales, le será requerido al proponente una acreditación en forma de declaración jurada, donde certifique como condición sine qua non que la torre será construida con el propósito de coubicar antenas de varias compañías; que es absolutamente necesario ubicar la torre en ese sector; las gestiones realizadas y sus resultados para ubicar sus estaciones de transmisión de frecuencia radial "antenas" en torres que no sean de su propiedad que estén dentro del sector en que se solicita permiso; y que, las gestiones realizadas y sus resultados para ubicar sus estaciones de transmisión de frecuencia radial "antenas" en torres que no sean de su propiedad aunque no estén dentro del sector, conforme a la estación de frecuencia radial "antenas" que se pretende instalar, pueda alcanzar la cobertura deseada; Disponiéndose, que la Junta de Planificación y la Administración de Reglamentos y Permisos, según sea el caso, tendrán la responsabilidad de verificar en todos sus méritos el contenido de la declaración previamente señalada en esta sección; requerir de los titulares de torres para la instalación de estaciones de transmisión de frecuencia radial "antenas", incluyendo las entidades públicas, brindar conocimiento a la Junta de Planificación, la Administración de Reglamentos y Permisos y a la Junta Reglamentadora de

---

[15] Véase además la Ley Federal de Telecomunicaciones, 47 USCA sec. 151 y ss.

Telecomunicaciones de Puerto Rico y al municipio de la disponibilidad de espacio para la instalación de estaciones de transmisión de frecuencia radial "antenas" en sus torres como parte de un uso integrado de facilidades de infraestructura; estableciéndose, que la determinación de disponibilidad de espacio no será contraria a las necesidades de mantenimiento, desarrollo o expansión del titular.

La Junta de Planificación establecerá mediante reglamento normas que promuevan la coubicación de antenas de más de una compañía de telecomunicaciones en una sola torre, de manera tal que se minimice la proliferación de torres en la isla. Estas normas deberán incluir parámetros para el trámite acelerado en el proceso de permisología [sic] para la ubicación y construcción de torres para la coubicación. 27 LPRA sec. 325.

Además, mediante la Ley Núm. 125 de 3 de agosto de 2014, Ley Núm. 125-2014, se incluyó el Artículo 8 a la Ley Núm. 89-2000 que dispone lo siguiente:

**Notificación de colindante y municipio**

Se le requiere a los proponentes de un proyecto para la ubicación o construcción de una torre de telecomunicaciones que, previo a la concesión de una autorización o permiso para la construcción de dicha torre por la agencia o ente gubernamental correspondiente, notifiquen a los colindantes de cualquier permiso u autorización solicitado ante dichas entidades gubernamentales para la ubicación o construcción de torres en las cuales se instalarán estaciones de transmisión de frecuencia radial "antenas" de carácter comercial y que se le requiera a los proponentes notificar a los colindantes en un radio de cien (100) metros en cualquier dirección tomando como centro la ubicación propuesta de la torre y que la misma incluya el nombre del proponente, relación del proyecto, ubicación exacta, número de caso ante la agencia y todo otro detalle que la Junta de Planificación la Oficina de Gerencia de Permisos y los Municipios Autónomos de Jerarquía de la I a la V bajo reglamento entiendan necesario exigir.

Además, se le requiere a los proponentes de un proyecto para la ubicación o construcción de una torre de telecomunicaciones que, previo a la concesión de una autorización o permiso para la construcción de dicha torre por la agencia o ente gubernamental correspondiente, notifiquen copia de la solicitud de permiso con todos sus anejos al municipio que corresponda para que éste tenga la oportunidad de evaluar el proyecto propuesto y presentar su posición al respecto. Dicha notificación deberá efectuarse dentro del plazo de diez (10) días de radicarse la solicitud. El municipio someterá sus comentarios justificados, mediante carta certificada a la Junta de Planificación o a la Oficina de Gerencia de Permisos, según corresponda, en un plazo que no excederá quince (15) días laborables, contados a partir de la fecha de notificación de la radicación de la solicitud. El municipio notificará copia de sus comentarios al proponente en la misma fecha en que los presente ante la agencia concernida. La Junta de Planificación o la Oficina de Gerencia de Permisos, según sea el caso, tomará en consideración la posición del municipio, aunque dicha posición no se convertirá en un impedimento para la obtención final del permiso. Además, la agencia o ente gubernamental correspondiente notificará al municipio copia de su determinación final en torno a la aprobación o denegación de la solicitud de permiso en el mismo día en que

se notifique tal determinación final al proponente. 27 LPRA sec. 326.

Además, la Ley Núm. 89-2000, *supra,* autorizó a la Junta de Planificación a promulgar y publicar un reglamento en aras de establecer los requisitos y normas aplicables a la construcción de las torres de telecomunicaciones. En cumplimiento de lo anterior y tomando en consideración que lo antes necesariamente incide en el proceso de permisología, las agencias concernidas aprobaron el Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo y Uso de Terrenos, Reglamento Núm. 7951. Posteriormente la Ley 161, *supra,* fue enmendada por la Ley 161-2009 y Ley 151-2013 y, en su consecuencia, el Reglamento Conjunto, fue enmendado y sustituido por otros que a su vez fueron objetos de revisión judicial.

### D. Reglamento Conjunto 2020

El Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios, mejor conocido como Reglamento Conjunto 2020, tenía como propósito unificar, en un orden lógico todas las reglas aplicables al uso y expedición de permisos.[16] Por su parte, el Capítulo 9 regula todo lo referente a los proyectos de construcción, instalación y ubicación de torres. El propósito principal es "establecer normas y procedimientos necesarios para la obtención de autorizaciones y permisos para los proyectos de instalación y ubicación de torres, así como establecer criterios para lograr la compatibilidad de las torres con las áreas adyacentes a su ubicación y para proteger la seguridad y salud de los residentes de las comunidades adyacentes"[17]

### Sección 9.11.2.2 Ubicación En Áreas Ecológicamente Sensitivas

Se cumplirá en estas áreas con las siguientes disposiciones:

---

[16] En *Martínez Fernández v. OGPe,* 2023 TSPR 75, 212 DPR ___ (2023) el Tribunal Supremo de Puerto Rico invalidó y declaró nulos los Reglamentos Conjuntos del 2019 y 2020 con efecto prospectivo al 16 de junio de 2023.

[17] Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios, Reglamento Núm. 9233, Departamento de Estado, 2 de diciembre de 2020.

a. Se observarán para dichas áreas las normas promulgadas para la ubicación y construcción de estructuras, si las hubiera, mediante la tramitación de una Consulta de Ubicación.

b. De no existir normas especiales, no se autorizará la ubicación salvo en aquellas situaciones de necesidad pública donde se demuestre claramente que dicha ubicación es la única alternativa para satisfacer dicha necesidad, considerando los últimos avances tecnológicos disponibles.

c. Cuando se determine inevitable la ubicación de una torre de telecomunicación en un área ecológicamente sensitiva se tomarán las medidas para reducir al máximo el impacto adverso visual y estético de la misma.

d. La celebración una vista pública es mandatoria previo publicación de un aviso de prensa, conforme a lo dispuesto en el Capítulo 2.1 del Tomo II.

e. Armonía con la Estética y el Entorno:

    1. Diseño de Camuflaje:

    a) Toda nueva ubicación, instalación o construcción de torre de telecomunicaciones o la instalación de instalaciones de telecomunicaciones deberá armonizar al máximo con la estética y el entorno de la localidad o sector en que se proponga, especialmente cuando sea indispensable su ubicación o instalación o construcción en áreas de reservas naturales, áreas urbanas, zonas históricas y a lo largo de las autopistas del País y rutas escénicas.

    b) En aquellos casos en que utilicen edificios como torres, las instalaciones deben estar integradas al diseño del edificio.

    c) A manera de ejemplo en aquellos casos de torres no tradicionales, tales como edificios, las instalaciones de telecomunicaciones deberán estar integradas al diseño del edificio y si se proponen ubicar en los techos de los mismos éstas deben ser incorporadas a su entorno mediante colores o uso de materiales que las oculten.

    2. Requisitos Mínimos de Camuflaje:

    a) Garantizar la total transparencia radio-eléctrica

    b) Resistencia a climas extremos y otras condiciones atmosféricas.

    c) Resistencia a los rayos ultravioletas.

    d) Los materiales deben tener sus características mecánicas y físicas a través del tiempo.

f. Recomendaciones del Gerente de Medioambiente de la OGPe: Como parte del proceso de evaluación de una consulta de ubicación para la instalación y ubicación de estas torres dentro de un área ecológicamente sensitiva, tendrán que obtenerse las recomendaciones del Gerente de Medioambiente de la OGPe, quien recomendará las medidas de mitigación correspondientes, incluyendo aquellos casos donde la ubicación de la torre o instalación de telecomunicaciones sea en la zona cárstica, conforme las disposiciones de la Ley 292-1999, titulada *Ley para la protección y conservación de la fisiografía cársica de Puerto Rico* según enmendada (Ley 292-1999).

g. Zonas Susceptibles a Inundaciones: Se permitirá la instalación o ubicación de torres de telecomunicaciones en terrenos clasificados como zonas susceptibles a inundaciones, conforme a los Mapas sobre Tasas del Seguro de Inundación, cumpliendo con las disposiciones del *Reglamento sobre Áreas Especiales de Riesgo a Inundación*, vigente (Reglamento de Planificación Núm. 13).

**Sección 9.11.2.4 Aviso o Notificación a los Dueños de Propiedades**

a. El proponente de un proyecto para la instalación o ubicación de una torre tendrá que notificar a los dueños de propiedades que radiquen dentro de una distancia radial de

cien (100) metros tomando como centro la ubicación propuesta, dentro de un término de diez (10) días a partir de la presentación. La notificación deberá ser mediante entrega personal o por correo certificado con acuse de recibo y deberá incluir lo siguiente:

    1. Nombre del proponente.

    2. Naturaleza de la torre propuesta (usos particulares a los que se dedicará la torre).

    3. Ubicación exacta del proyecto, tales como la dirección física, coordenadas y número de catastro, entre otros, que describa la ubicación.

    4. Número del caso ante la agencia.

b. Deberá cumplir con la notificación a colindantes de acuerdo a la Sección 2.1.9.7 del Tomo II en este Reglamento.

c. En aquellos casos en que el nombre o la dirección postal de algún colindante inmediato no esté accesible al solicitante o que haya sido devueltas, se utilizará el método alterno indicado en la Sección 2.1.9.8 del Tomo II en este Reglamento.

d. La parte proponente tendrá que cargar al sistema de la OGPe evidencia de dicha notificación dentro del mismo término, hasta tanto no se cargue esta información al sistema la solicitud no será evaluada.

e. En el caso de co-ubicaciones, siempre y cuando la torre tenga los correspondientes permisos de construcción y uso, no será necesaria la notificación a los dueños de propiedades.

f. La agencia o ente gubernamental correspondiente notificará al municipio copia de su determinación final entorno a la aprobación o denegación de la solicitud de permiso en el mismo día en que notifique tal determinación final al proponente.

**Sección 2.1.9.8 Método Alterno de Notificación**

a. Se entenderá como notificación adecuada aquella enviada por el solicitante a la dirección de los colindantes que obran en el CRIM, en cuyo caso, deberá anejar evidencia en el expediente digital de envío por correo certificado.

b. Podrá sustituir el requisito de entrega mediante correo certificado, entregando la misma personalmente cuando los ocupantes de la propiedad, sean los establecidos en el CRIM o el titular de la misma. En este caso, acusará recibo de la entrega en la que se haga constar el nombre, la dirección física, y la firma del notificado certificando que es el titular de la propiedad.

c. Aquellos casos en que la dirección postal de algún colindante inmediato no esté accesible en el CRIM, y en la propiedad resida o sea esté habitada por el titular, arrendatario o poseedor, o utilizada, se podrá entregar la misma personalmente al ocupante de la propiedad.

    1. Se anejará una certificación haciendo constar la falta de información en el CRIM y la entrega al ocupante de la propiedad, con expresión del nombre, fecha de entrega y la dirección física del lugar.

    2. De no estar ocupada o no poder localizar a su ocupante, presentará una certificación de esta información y las gestiones realizadas para cumplir con esta notificación.

d. Para aquellos casos de proyectos suprarregionales de infraestructura pública, se permitirá la notificación mediante aviso público en un periódico de circulación general y regional.[18]

**E. Reglamento para Proyectos de Construcción, Instalación y ubicación de Torres y Facilidades de Telecomunicaciones**

---

[18] Con el Reglamento Conjunto de 2010 citado por los recurrentes se identifica las mismas disposiciones de las secciones 44.1.2, 44.18, 44.7.1 y 6.3.4.

El Reglamento para Proyectos de Construcción Instalación y ubicación de Torres y facilidades de telecomunicaciones, Reglamento Núm. 6721,[19] tiene como función principal fiscalizar la autorización de permisos para la instalación de las torres de telecomunicaciones y de esta manera crear criterios que salvaguarden la salud y seguridad de los residentes adyacentes.

**III.**

En el primer señalamiento de error, los recurrentes plantean la nulidad de los Reglamentos Conjuntos 2019 y 2020, respectivamente. Como se sabe (y según reseñado en la parte I) lo antes fue atendido mediante nuestro dictamen emitido el 10 de febrero de 2022 y fue objeto de revisión ante el Alto Foro mediante su pronunciamiento *Per Curiam* emitido el 16 de junio de 2023, por lo que, resulta innecesario atender la discusión del primer error.

En el segundo señalamiento de error, los recurrentes arguyen, en apretada síntesis que, la OGPe incidió al no permitir la intervención de la Asociación de Residentes de Castillo del Mar en la presente causa. Resulta evidente que, la Asociación interpuso su solicitud de intervención el 13 de septiembre de 2021, luego reiteró su reclamo el 30 de septiembre de 2021 y el 13 de noviembre de 2021, respectivamente. La agencia recurrida ignoró los reclamos de la Asociación y no fue hasta después de emitir el permiso de construcción que denegó la última solicitud de intervención como si hubiera sido la única petición y presentada de forma tardía. Ahora bien, la OGPe denegó la solicitud de intervención de la Asociación mediante *Resolución* emitida y notificada el 15 de noviembre de 2021.

De ahí, conforme la normativa aplicable, la Asociación contaba con treinta días para acudir en revisión ante esta Curia y no lo hizo. Ciertamente, reconocemos que la Asociación es una

---

[19] Reglamento para Proyectos de Construcción, Instalación y Ubicación de Torres y Facilidades de Telecomunicaciones (Reglamento de Planificación Núm. 26), Reglamento Núm. 6721, Departamento de Estado, 14 de noviembre de 2003.

entidad con personalidad jurídica distinguible e independiente de Edwin Martínez Fernández y Alberto L. Ortiz Molina. Es por ello, que, los aquí recurrentes no gozan de legitimación activa[20] para reclamar los derechos de la Asociación en aras de impugnar la denegatoria de la solicitud de intervención interpuesta por dicha entidad. En su consecuencia, no ostentamos jurisdicción para entretener los planteamientos esbozados en el segundo señalamiento de error.

En el tercer señalamiento de error, la parte recurrente sostiene que, la OGPe incidió al no cumplir con los requisitos de notificación a los residentes colindantes del radio de seguridad o la distancia radial de cien (100) metros, así como las normas de coubicación.

Para fundamentar su postura, los recurrentes citan la Sección 44.1.8 en la Regla 44.1 del Capítulo 44 del Reglamento Conjunto de 2010[21] y la Ley 89-2000, *supra*, que establece los requisitos para el Aviso o Notificación a Dueños de Propiedades. Destacan que, dicha notificación deberá efectuarse dentro del término de diez días desde que se presente la solicitud de proyecto de instalación o ubicación de una torre. También exige que, previo a la concesión del permiso, el proponente notifique en un radio de cien (100) metros a cualquier colindante en cualquier dirección desde el centro de la ubicación de la torre propuesta. La notificación deberá hacerse por correo certificado con acuse de recibo o mediante entrega personal. La parte recurrente centra su argumento en el hecho que, QMC solo notificó a "uno de los aproximadamente 250 residentes del Complejo Castillos del Mar, conforme a derecho".

Por su parte, la OGPe resalta en su *Oposición* que, el Artículo en la Sección 9.11.2.4 del Reglamento Conjunto 2020, (sobre aviso o notificación) precisamente hace referencia a la Sección 2.1.9.8

---

[20] Véase lo resuelto en *Hernández, Santa v. Srio de Hacienda* 208 DPR 727,738-739 (2022).
[21] Equivalente a la Sección 9.11.2.4 del Reglamento Conjunto de 2020.

mediante la cual permite que se utilice un método alterno de notificación. Por medio de dicha disposición, se permite sustituir la notificación requerida, mediante entrega por correo certificado o personalmente a los residentes, según las listas provistas por el CRIM. De no localizar un ocupante se deberá presentar una certificación de información y las gestiones realizadas para cumplir con la notificación. En los casos de proyectos regionales de infraestructura pública, se permite la notificación por aviso público en un periódico de circulación general o regional.

OGPe informa que, en el expediente surge que, QMC instaló un rótulo en la propiedad, siendo este un método de notificación. Señala que, mediante un escrito de 30 de junio de 2021, el Arq. Edgar R. Montañez Pérez certifica que, se notificó a los colindantes a 100 metros, desde el centro de la torre. Junto a su propuesta, incluye una declaración jurada informando sobre la notificación a los vecinos, el modelo de carta enviada por correo certificado y la entrega personalmente, certificaciones de envío por correo, mapa del CRIM, lista de colindantes, evidencia de publicación de edicto en el periódico El Nuevo Día y evidencia de notificación al Municipio de Ceiba. Con relación al Condominio Castillos del Mar destacó que, se notificó a la dirección provista por el CRIM y personalmente a través de Luzbeth Guzmán (asistente del administrador del Condominio). Por su parte, QMC destaca que, la sección 6.3.2 del Reglamento Conjunto de 2010[22] permite notificar a un condominio a la dirección de la Asociación de Residentes o condómines, y así se realizó en este caso. Lo antes, a su entender, hace innecesario notificar a cada apartamento.

Evaluado lo anterior, colegimos que la OGPe no incidió al determinar que QMC acreditó la notificación requerida a los colindantes, según lo permite la normativa antes expuesta y en

---

[22] Página 15 de la *Oposición* haciendo referencia al inciso (b) de dicha Sección, así como a la Sección 6.3.4 del Reglamento Conjunto de 2010 que, a su vez corresponde a la Sección 2.1.9.8 del Reglamento Conjunto de 2020.

particular el método alterno de notificación. Tampoco la parte recurrente nos ha puesto en posición para intervenir sobre este asunto, toda vez que, al discutir el presunto error no impugnó propiamente el uso del método alterno en este caso. Resulta evidente que, el proponente utilizó el método alterno para notificar, lo cual es permitido por el Reglamento 2020 (sección 2.1.9.8), así como por el Reglamento 2010 (sección 6.3.4). La postura de la parte recurrente sobre este señalamiento no es suficiente para derrotar la eficacia del proceso de notificación en este caso.

Superado lo anterior, nos corresponde atender otro aspecto del recurso discutido en el tercer error. En síntesis, la parte recurrente arguye que, la Ley 89-2000, *supra*, dispone en su Artículo 3, inciso d, que la coubicación ha demostrado ser una de las prácticas que reduce la proliferación de torres, ya que permite el que, más de una compañía de telecomunicaciones ubique sus facilidades en una misma torre. Asimismo, cita las Secciones 44.1.2, 44.7 del Reglamento Conjunto de 2010[23] sobre coubicación. Arguye que, en el caso de autos, la torre en controversia fue ubicada en una zona residencial donde hay un mínimo de dos torres adicionales a menos de una milla de distancia (.83 millas) y otras cuatro, a poco más de una milla de distancia, según consta en la declaración jurada de la parte proponente.

Los recurrentes cuestionaron las razones dadas por QMC para descartar la coubicación. Exponen que, la declaración jurada no cumple con la sección 44.4.1 del Reglamento Conjunto de 2010,[24] la cual establece que, la torre será construida con el propósito de coubicar antenas de varias compañías y, si es absolutamente necesario, ubicar la torre en ese sector en particular. Entiéndase que, se permite la ubicación próxima de una torre de telecomunicaciones con otra u otras existentes, si se demuestra que

---

[23] Equivalente a las secciones 9.11.1.2 y 9.11.5 (se añadieron los incisos c y d al inciso 9.11.5.1) en el Reglamento Conjunto 2020.
[24] *Íd.*

las facilidades existentes y cercanas exceden la capacidad del edificio ya construido y su mejora o ampliación no es posible a un costo razonable; que la torre existente no posee la localización adecuada, espacio, acceso o altura necesaria para acomodar el equipo propuesto que impida sus funciones. La parte recurrente sostiene que, la declaración jurada para fundamentar la propuesta de QMC resulta insuficiente porque no desglosa las gestiones específicas realizadas y la consideración de todos los criterios antes explicados. Arguye que, la declaración es general por corresponder a una mera "inspección visual del sector" y no a una opinión informada de datos de altura y capacidad estructural para no coubicar al cliente de QMC en las mismas facilidades existentes en el área.

Por su parte, la OGPe sostuvo que se hace necesaria la facilidad propuesta, debido a que, no existen torres dentro del radio de una milla que puedan ofrecer la cobertura deseada por QMC para su contrato con la compañía Claro en el sector que pretenden cubrir. Explica que, de su examen de la declaración jurada del Director de Operaciones de QMC Telecom LLC se determinó que, la cobertura solicitada corresponde a la cobertura para comunidades del Barrio Machos de Ceiba, Marina Puerto del Rey, Comunidades las Colinas de Santa María, Santa María, Las Vegas, Residencial Mundo Plaza, Villas del Pilar, Brisas de Ceiba I, Residencial La Ceiba, Villa Ávila, Villa Flores, áreas entre las carreteras PR-3, PR-979, PR-53, PR-982, PR-975 y la cobertura marítima en el área de Bahía Damajagua.

En particular, la agencia recurrida destaca que, de las dos facilidades encontradas, una no posee la capacidad estructural para coubicar y la otra provee cobertura a otro sector. Además, que las torres que están fuera del radio de una milla no ofrecen cobertura con la capacidad necesaria por factores de distancia, densidad poblacional y la topografía de la región. En fin, sostiene que, la declaración jurada resulta suficiente para cumplimentar lo

requerido en el Artículo 7 de la Ley 89-2000, *supra,* así como del Reglamento Conjunto del 2020.

Por su parte el recurrido, QMC, sostiene que, la declaración jurada resulta suficiente para fundamentar su propuesta. Centra su argumento en que los recurrentes no establecen prueba que contradiga la prueba presentada por QMC.

Evaluado lo anterior, colegimos que la agencia recurrida no incidió al determinar que la declaración jurada presentada contiene suficientes bases para sostener la determinación recurrida toda vez que hace correlación con los documentos que demuestran que las estructuras existentes no poseen la localización adecuada, espacio, acceso o altura necesaria para alcanzar la cobertura requerida. A lo anterior se añade que, los recurrentes no han presentado evidencia que surja del expediente administrativo que, obligue a esta Curia a intervenir con el peritaje de la agencia con el propósito de suprimir las normas de deferencia aplicable a la presente causa.

En el cuarto señalamiento de error, los interventores arguyen que, la OGPe no cumplió su deber ministerial de paralizar la obra en atención al hecho de que, existe una solicitud de evaluación ambiental pendiente ante la FCC. Exponen que, la instalación propuesta se encuentra en las inmediaciones de una reserva natural en zona inundable y alterará el hábitat de cinco especies en peligro de extinción. Estimaron que, la agencia recurrida debió paralizar el proceso de permiso hasta tanto se culminara el proceso ante la FCC.

En reacción a lo antes, los recurridos explican que, en el expediente surgen varias recomendaciones que hacen innecesario paralizar la obra, pendiente a la determinación de la FCC. Cónsono con ello, destacan que obra en el expediente administrativo los siguientes documentos: la Determinación de Inundación 2021-00-JDI-7147 de la Oficina de Geología e Hidrología de la Junta de Planificación de Puerto Rico y un Certificado de Elevación de FEMA proponiendo una plataforma de hormigón de 33´-0" x 44´-0" dividida en cuatro espacios y elevada a 7 pies sobre el terreno, en aras de

cumplir el Reglamento de Planificación Núm. 13. Además, señalan que, la Determinación de Cumplimiento Ambiental para Evaluación Ambiental (2020-301952-DEA-005113) fue emitida el 1 de febrero de 2019 y en esta se determinó que, el proyecto no afectaría a ninguno de los sistemas ni hábitats circundantes durante la construcción u operación.

Por su parte, QMC destacó que, el lugar escogido para ubicar la facilidad de telecomunicación no es un humedal ni se encuentra en las inmediaciones de una reserva natural. Admite que, existen humedales cercanos a la ubicación propuesta. Sin embargo, en atención a ello, se realizó un estudio intitulado *Jurisdiccional Wetland and U.S. Waters Determination Study* (a través de la firma Coll Rivera Environmental) que, en su conclusión sostuvo que, específicamente en el área del proyecto no hay humedales. Explicó que, para cumplir con lo requerido por la zona AE (de zonas inundables de FEMA con 1% de probabilidad de inundación anual) la empresa certificó que la instalación cumple con los criterios de elevación para zonas AE del Reglamento de Planificación y la Sección 9.11.2.2g del Reglamento Conjunto de 2020.[25]

De lo anterior, se desprende que, en atención a los referidos planteamientos la parte proponente presentó varios datos de fuentes cuya confiabilidad no ha sido impugnada por los recurridos interventores. Ante este cuadro, colegimos que, la agencia no incidió al rechazar el petitorio de paralización de los procesos. Tampoco observamos que la parte recurrente nos haya puesto en posición para determinar que la agencia recurrida haya actuado con arbitrariedad y sin bases jurídicas para rechazar la solicitud de paralización. Dicha determinación administrativa se encuentra sostenida con el expediente administrativo. El cuarto error no se cometió.

---

[25] Sección 9.11.2.2: Ubicación en Áreas Ecológicamente Sensitivas, inciso g-Zonas Susceptibles a Inundaciones.

Como se puede apreciar, hemos examinado sosegadamente la totalidad del expediente con el beneficio de los escritos de las partes y concluimos que los errores señalados no se cometieron. El Tribunal Supremo ha reafirmado que, los tribunales debemos conceder deferencia judicial al *expertise* administrativo cuando se trata de leyes y reglamentos que le corresponde a la agencia poner en vigor. *OEG v. Martínez Giraud,* supra. Valga aclarar que, el referido marco de deferencia cede si surge del expediente evidencia sustancial para concluir que la agencia actuó de forma arbitraria, caprichosa o ilegal. *Íd.* Apoyados en esta premisa, y ante el hecho de que los recurrentes no lograron rebatir la presunción de corrección o legalidad de las determinaciones expuestas por la OGPe, el dictamen impugnado merece nuestra deferencia.

**IV.**

Por todo lo antes esbozados, confirmamos el dictamen administrativo recurrido.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones